UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 25-10288-LTS |
| | ) | |
| THEODORE RICHARDS, III, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER ON MOTION TO SUPPRESS (DOC. NO. 108)

June 8, 2026

SOROKIN, J.

The indictment charges Theodore Richards with conspiracy to distribute and to possess

with intent to distribute cocaine and fentanyl.  Doc. No. 22.[1]  Richards moves to suppress all

evidence derived from the search of a Subaru Crosstrek the FBI impounded following Richards's

arrest.  Doc. No. 108.  The matter is fully briefed, and the Court held an evidentiary hearing on

May 28, 2026.  For the reasons that follow, Richards's motion to suppress is DENIED.

I.    BACKGROUND

    A.    Facts[2]

    At approximately 2:30 p.m. on May 13, 2025, Richards was arrested in Chicago by FBI

agents and task-force officers acting pursuant to an arrest warrant issued by a magistrate judge in

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system ("ECF"); pincites are to the page numbers in the ECF header or, for documents organized by paragraph, to paragraph numbers.

[2] The Court finds these facts based on the exhibits submitted by the parties: the FBI report of Richards's arrest, including logs of the items seized from his person and from the Subaru (Doc. Nos. 108-1, 123-1, 125-2); the affidavit supporting the criminal complaint (Doc. Nos. 108-2, 117-1); body-worn camera footage of Richards's arrest recorded by FBI agents (Doc. No. 123); and Richards's affidavit regarding the Subaru (Doc. No. 125-1).  The Court also considers, as relevant and uncontroverted for present purposes, the search-warrant affidavit (Doc. No. 102-3),

this District.  Doc. No. 108-1 at 6, 12; see also Doc. Nos. 4, 5.  The government's investigation and prosecution of Richards are based in this District; FBI agents in Boston asked their counterparts in FBI Chicago to help locate and arrest Richards.

On the day of his arrest, Richards traveled to Chicago from Columbus, Ohio. Investigators obtained surveillance footage from around 7:00 a.m. on May 13, 2025, showing Richards exiting a Columbus apartment building's elevator carrying a dark-colored backpack.[3] Doc. No. 102-3 ¶ 41.  The drive from Columbus to Chicago takes five to six hours.  Id. ¶ 42.

Agent Resar testified that investigators told the Chicago FBI agents Richards was believed to be in Chicago and was associated with a white Subaru Crosstrek bearing a particular Ohio license plate.  The Subaru belonged to Richards's brother.  Doc. No. 125-1 ¶ 4.  With his brother's permission, Richards had been borrowing the vehicle for a few days.  Id.  Richards "expect[ed] that [his] use was exclusive during this time and that any items [he] kept inside the vehicle would be private and secure."  Id.

The agents located the Subaru—which was legally parallel parked on the "westside of South Eberhart Avenue, between E 31st Place and East 32nd Street," a public road—and placed the vehicle under surveillance.  Doc. No. 108-1 at 12; Doc. No. 123, Exs. A–C (video footage); Doc. No. 125-1 ¶ 3.  About five to ten minutes after locating the parked Subaru, the surveilling officers observed Richards walk toward the Subaru and open its front driver-side door.[4]  Doc.

---

see Doc. No. 126, as well as the testimony of FBI Supervisory Special Agent Jeremy Resar given at the May 28 evidentiary hearing.

[3] At the evidentiary hearing, counsel for the government represented that investigators had obtained this surveillance footage prior to Richards's arrest, which occurred at roughly 2:30 p.m. on May 13, 2025.  Defense counsel did not object to or contradict this representation.  The Court credits counsel's representation for present purposes.

[4] The Court finds that Richards had opened the Subaru's front driver-side door and was standing in the open door at the time of his arrest.  This finding is not now in dispute.  The Court briefly recounts the evolution of the evidence that supports this finding.  Doc.

No. 108-1 at 12.  At the time of the arrest, Richards was standing in the open door of the Subaru, which was otherwise unoccupied.  See Doc. No. 123 at 2 (stills captured from officer's body-worn camera); see also Doc. No. 123, Exs. A–C (video footage); Doc. No. 108-1 at 12.  Richards "was about to enter" the car when he was arrested.  Doc. No. 125-1 ¶ 3.  Agent Resar testified (and the body-camera footage shows) that the Subaru's door was open at the time of Richards's arrest; Resar explained that the agents closed the door but did not search the vehicle on scene.

At the scene, officers searched Richards's person and seized several keys and a key fob, as well as an iPhone, nine prepaid debit cards, and more than $17,000 in cash.[5]  Doc. No. 108-1 at 12, 20; see also id. at 3–5, 15–19.  Richards was then placed in an FBI-issued vehicle and driven to FBI Chicago for processing before he was remanded into the custody of the Bureau of Prisons pending his initial appearance.  Id. at 13.

---

The FBI report narrative states that the officers observed Richards "walking towards the Crosstrek" and that Richards "proceeded to the vicinity of the Crosstrek where he was taken into custody without incident."  Doc. No. 108-1 at 12 (citation modified).  Citing the FBI report, Richards initially contended that he "did not touch or make contact with the automobile before being taken into custody."  Doc. No. 108 at 1 (citing Doc. No. 108-1 at 12).  The government's initial opposition similarly indicated that Richards "was arrested as he approached a white Subaru parked on a public street."  Doc. No. 117 at 3 (emphasis added); see also id. at 13 ("Defendant was arrested as he walked towards the Subaru.").  These characterizations were in tension with the facts the Court found in resolving Richards's first suppression motion—facts supported by the search-warrant affidavit and not then disputed by the parties.  See Doc. No. 103 at 2 (noting that at time of arrest Richards was "opening the driver-side door of an otherwise-unoccupied Subaru Crosstrek registered to a person believed to be his brother" (citing Doc. No. 102-3 ¶¶ 37–38)); see also Doc. No. 103 at 2 n.4; Doc. No. 102-3 ¶ 40.

The Court ordered supplemental briefing on this issue.  Doc. No. 121.  The government submitted the body-worn camera footage cited above, which shows Richards standing inside the open driver-side door of a parked and otherwise-unoccupied Subaru at the time of his arrest.  Doc. No. 123.  Richards submitted an affidavit in which he avers: "At the time of my arrest, I was about to enter a white Subaru CrossTrek" that "belonged to my brother" and that "I had legally parked on the street."  Doc. Nos. 125, 125-1.  The Court credits the body-worn camera footage and affidavit, which are now undisputed.

[5] Richards's briefing suggests that the officers seized about $900 from his person.  Doc. No. 108 at 1.  But the evidence on which he relies shows that the officers seized $950 from his wallet and another $16,895 from elsewhere on his person.  Doc. No. 108-1 at 12, 16–17.

The agents then towed the Subaru to the FBI Chicago field office.  Doc. No. 108-1 at 14.
Agent Resar testified that he made the decision to impound the Subaru because the car had an
out-of-state license plate and Richards was facing a serious drug-trafficking charge in a far-away
District; the agent "didn't want the vehicle sitting there forever."  He testified that the car was
legally parked, was not disabled, and was not impeding traffic or otherwise posing a danger at
the time of its impoundment.  The agents did not ask Richards whether someone else was
available to take possession of the (unoccupied) vehicle—and Richards did not proactively
suggest that anyone else could take custody of the car.  Agent Resar testified that he was not
thinking of FBI internal policies or protocols regarding vehicle impoundment when he decided to
have the Subaru towed.  Instead, his decision was based on his understanding of the law and
what was appropriate under the circumstances.

Once the Subaru was towed to the FBI field office, "an inventory search was conducted."
Doc. No. 108-1 at 14.  Several hours after Richards's arrest, Special Agent Hunter Brooks seized
from the Subaru "Miscellaneous keys and key fobs," an "iPhone 13 found in backpack," an
"iPad found in backpack," and "iPhone 13 and i[P]ad mini protective cases."  Id. at 12, 22–23
(7:00 p.m. ET on May 13, 2025).  The next day, Agent Brooks seized a "Dash Cam with SD
Card," "$26 . . . found in SUV console," and "$254 . . . found in backpack in rear of SUV."  Id.
at 22 (1:00 p.m. ET on May 14, 2025).  These items were apparently inventoried in a document
that was not placed in the record before the Court.  Id. at 21 (noting inventory was "documented
in serial 2011 of the captioned case file").  The subset of the inventoried property that was later
seized into evidence was documented in a form FD-1087 entitled "Inventory search of Subaru
Crosstrek OH:JWT9575," which was completed on June 18, 2025.  Id. at 21–23.  The form
indicates that no receipt was given.  Id. at 21.

4

B.    FBI Inventory-Search Policy

The government submitted excerpts of the FBI's Domestic Investigations and Operations Guide ("DIOG") addressing inventory searches.[6]  Doc. No. 117-2.  The DIOG defines the three purposes of an "inventory search" as to: "1) protect the owner's property while it is in FBI custody; 2) protect the FBI against claims of lost or stolen property; or 3) protect FBI personnel from potential danger."  Id. at 4.  It explains that "in order for an inventory search to be valid, agents must first have lawful custody of the property."  Id.; see also id. at 6.  The DIOG directs: "As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents."  Id. at 5, 6.  The DIOG gives the following example of a proper inventory search under FBI policy:

> Agents conduct a felony traffic stop and arrest the driver pursuant to a federal arrest warrant.  Because the vehicle he was driving cannot be left unattended along the roadway, agents may take possession of the vehicle and have it towed to an FBI garage.  Pursuant to FBI policy, and as part of an administrative caretaking function, agents are permitted to inventory the contents of the vehicle, and may open any closed containers, locked or unlocked, and secured areas, including the trunk or glove box.

Id. at 7.

The DIOG specifies that a written summary of the inventory "must be recorded in an FD-302, an FD-597. . . , or an FD-653," and an agent "must provide receipts for all items retrieved during inventory searches"; an agent should also memorialize any "non-inventory-related-search conducted and any evidence collected" in an FD-1087.  Id.  Finally, the DIOG emphasizes that agents "may not perform inventory searches solely for investigative purposes," id. at 5, and

---

[6] Although the government filed the DIOG excerpts under seal, the government does not object to the Court quoting from and paraphrasing its submission here.  The government did not submit a policy specifically addressing impoundment, if such a policy exists.  See also Doc. No. 126.

directs agents to obtain a search warrant "when feasible" whenever there is "probable cause to believe an inventory search would also yield items of evidence or contraband," id. at 5, 7.

      C.     Procedural History

On March 4, 2026, Richards moved to suppress "all evidence derived from the search of the Subaru SUV following his May 13, 2025 arrest." Doc. No. 108. This is Richards's second motion to suppress; the Court denied his earlier motion to suppress the fruits of a search of his cell phone. See Doc. Nos. 92, 103. Richards argues that the search of the Subaru, which was not authorized by a warrant, did not fall within any exception to the warrant requirement. Doc. No. 108. The government opposed, arguing that the impoundment and inventory search were an exercise of law enforcement's community-caretaking function or, alternatively, that the agents had probable cause to search the Subaru for evidence of drug trafficking. Doc. No. 117.

The Court held an evidentiary hearing on May 28, 2026. Doc. Nos. 126, 137. The only evidence offered at the hearing was Agent Resar's testimony, discussed above. The Court now resolves the motion to suppress.

## II.    LEGAL STANDARD

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, the Fourth Amendment requires that officers obtain a warrant before conducting a search. Arizona v. Gant, 556 U.S. 332, 338 (2009). The warrant requirement is "subject only to a few specifically established and well-delineated exceptions." Id. (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). Relevant here are the community-caretaking exception and the automobile exception. See, e.g., United States v. Del Rosario, 968 F.3d 123, 126 (1st Cir. 2020) (citing Cady v. Dombrowski, 413 U.S. 433, 441–43 (1973)); California v. Acevedo, 550 U.S. 565, 580 (1991).

The government has the burden of proving, by a preponderance of the evidence, the lawfulness of a warrantless search.  See, e.g., United States v. Gonsalves, 859 F.3d 95, 103 (1st Cir. 2017); see also United States v. Matlock, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

III.   DISCUSSION

The government initially challenged Richards's Fourth Amendment "standing"[7] to challenge the search, but it subsequently conceded, in light of Richards's affidavit, that Richards had established standing.[8]  Doc. No. 132 at 1 (citing Doc. No. 125-1).  That concession is well founded.  See United States v. Almeida, 748 F.3d 41, 47–48 (1st Cir. 2014); cf. Byrd, 584 U.S. at 409.  The Court proceeds to evaluate whether the government has shown that the search fell within a recognized exception to the warrant requirement.

A.   Community-Caretaking Exception

"Generally, a law enforcement officer may only seize property pursuant to a warrant based on probable cause describing the place to be searched and the property to be seized."  Del Rosario, 968 F.3d at 125–26 (quoting United States v. Coccia, 446 F.3d 233, 237–38 (1st Cir. 2006)).  The government had no warrant to seize the Subaru or to search its contents.  Instead, to justify the impoundment, the government "relies primarily on the community-caretaking

---

[7] The Court uses the "term 'standing' as a shorthand method of referring to the issue of whether the defendant's own Fourth Amendment interests were implicated by the challenged governmental action," though it acknowledges that "matters of standing in the context of searches and seizures actually involve[] substantive Fourth Amendment law."  United States v. Kimball, 25 F.3d 1, 5 n.1 (1st Cir. 1994) (citation modified); see also Byrd v. United States, 584 U.S. 395, 410–11 (2018) (noting that Fourth Amendment "standing," unlike Article III standing, is "not a jurisdictional question").

[8] It is "well settled" that such an affidavit, "given to meet standing requirements," cannot be used as direct evidence against Richards at an eventual trial.  United States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994) (citation modified).

exception to the warrant requirement," an exception that encompasses "law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience." Id. at 126 (citation modified); see also Cady, 413 U.S. at 441–43. The government further argues that the subsequent search of the Subaru was a reasonable inventory search conducted pursuant to FBI policy. The Court considers the impoundment and the search in turn. See United States v. Vick, 145 F.4th 191, 197–98 (1st Cir. 2025) ("The decision to impound a vehicle (the seizure) is properly analyzed as distinct from the decision to inventory a vehicle (the search)." (citation modified)).

"[I]mpoundments of vehicles for community caretaking purposes are consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances." Coccia, 466 F.3d at 239. "The impound decision must be justified by a legitimate, non-investigatory purpose and cannot be a mere subterfuge for investigation, but the coexistence of investigatory and caretaking motives will not invalidate the seizure." United States v. Sylvester, 993 F.3d 16, 23 (1st Cir. 2021) (citation modified); accord Vick, 145 F.4th at 198, 200–02; see also Del Rosario, 968 F.3d at 126 ("As applied to the seizure of an automobile, the community-caretaking function turns in great part on the police officer's reasons for seizing the vehicle."). The Constitution affords officers discretion when carrying out their community-caretaking functions; officers need not "select the least intrusive . . . or most optimal . . . way of fulfilling their community caretaking responsibilities." Vick, 145 F.4th at 198 (citation modified).

When a vehicle impoundment follows a standardized protocol, the impoundment is often (though not always) reasonable for Fourth Amendment purposes. Coccia, 464 F.3d at 238; see also Del Rosario, 968 F.3d at 126–27 (noting that "the presence of a department protocol

spelling out when there existed noninvestigatory reasons to impound a vehicle would be a significant factor cutting in favor of blessing a seizure done pursuant to such an objective protocol"). Even without an explicit, standardized impoundment protocol, a noninvestigatory seizure may be reasonable under the circumstances. Coccia, 464 F.3d at 238; Del Rosario, 968 F.3d at 127. Pertinent factors include whether:

> (1) a rental company owned the car; (2) the car could not legally be driven; (3) the potential [exists that] dangerous materials [might be] in the vehicle; (4) the car was on the property of another; (5) the defendant would be indisposed for a long time; (6) the car was packed full of personal property that might be stolen; (7) the car was in an area known for criminal activity; (8) there was no one else immediately available to take the vehicle; and (9) the car was parked illegally or dangerously and might be best not left behind.

Del Rosario, 968 F.3d at 127 (citation modified).

On the record before the Court, the agents impounded the Subaru in the absence of a formal impoundment policy or protocol. The government has not submitted an impoundment policy (despite submitting an inventory-search policy), and Agent Resar testified that he was not conscious of such a policy at the time he directed FBI agents to tow the Subaru. The indirect reference to impoundments within the inventory-search policy, Doc. No. 117-2 at 7, without more, does not constitute an impoundment policy.

Despite the absence of a formal impoundment policy or protocol, however, the Court concludes that the impoundment of the Subaru was objectively reasonable under the circumstances in order to protect the vehicle and its belongings from the risk of theft or damage. See, e.g., United States v. Ramos-Morales, 981 F.2d 625, 626–27 (1st Cir. 1992) (noting government's "legitimate interest in reducing automobile theft and damage"); United States v. Rodriguez-Morales, 929 F.2d 780, 785–86 (1st Cir. 1991) (concluding "it was completely appropriate for the police to impound the car and bring it to the barracks for safekeeping" when

the vehicle otherwise "would have posed a safety threat . . . [and] been easy prey for vandals"). Several factors support this conclusion.

First, at the time of his arrest, Richards had the key to and exclusive control over the Subaru, which was open, unlocked, unoccupied, and parked on a public street. Upon his arrest, the risk of loss for the vehicle and its contents shifted from Richards to the agents, and the agents could and did take reasonable measures to minimize that risk. Under the circumstances (and as further explained below), to leave the Subaru as they found it may have exposed the agents and the FBI to liability and would have been generally irresponsible.

Second, no one else was present on scene with Richards, and the agents had no reason to believe that anyone was available to take possession of the car. On the record before the Court, Richards had sole possession of the vehicle for, at least, the several hours since he left Ohio. See Doc. No. 125-1 ¶ 4 (Richards's affidavit) (attesting that brother "permitted me to borrow the vehicle 3-4 days prior to my arrest" and that "I had an expectation that my use was exclusive during this time"). Richards did not tell or suggest to the agents that his brother or anyone else could take custody of the car. Where, as here, "a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason [for] impounding the car." Coccia, 446 F.3d at 240 (emphasis in original) (quoting Vega-Encarnación v. United States, 344 F.3d 37, 41 (1st Cir. 2003)); see also United States v. Goodrich, 183 F. Supp. 2d 135, 139–41, 143–44 (D. Mass. 2001) (observing that "whether an appropriate person is available to move the car is central to an evaluation of the reasonableness of any decision to seize a vehicle" and concluding that, where defendant's wife was present and authorized to take responsibility for car, impoundment was mere pretext for investigatory search). Although the agents did not ask Richards whether someone else could take the vehicle,

10

they were under no Fourth Amendment obligation to do so.  See Sylvester, 993 F.3d at 24 (citing Coccia, 446 F.3d at 240 n.7).

Third, as Richards acknowledges, see Doc. No. 125 at 7, he was facing serious drug-trafficking charges out of this District, hundreds of miles from the place where he was arrested. Given these charges—and the applicable presumption of pretrial detention, 18 U.S.C. § 3142(e)(3), (f)(1)—it was reasonable for the agents to conclude that Richards would be unable to pick up the car any time soon.  If the agents had not towed the Subaru, it may have remained parked on a public street in Chicago, away from its owner in Ohio and its occupant in federal custody, for an indeterminate time.

Fourth, and relatedly, Agent Resar credibly testified that he ordered the vehicle towed for its safekeeping because he did not want it "sitting there forever."  Together, these factors demonstrate that the impoundment was objectively reasonable for the noninvestigative purpose of safeguarding the vehicle and its contents.

It is true that the Subaru was lawfully parked and was not impeding traffic or otherwise posing a danger at the moment of Richards's arrest.  But, under some circumstances, officers may reasonably impound lawfully parked vehicles to protect the vehicles from theft or damage. See, e.g., United States v. Staller, 616 F.2d 1284, 1289–90 (5th Cir. 1980) (impoundment reasonable where car legally parked in mall lot but arrested driver was from out of state and nobody else was available to assume responsibility), cited in Rodriguez-Morales, 929 F.2d at 786.  Such circumstances were present here.  Even if it is appropriate to consider the subjective motivations of the agents who impounded the vehicle, nothing in the record before the Court

11

suggests that the agents' sole motive for impoundment was investigatory.[9]  Vick, 145 F.4th at 200–01.

The Court therefore concludes that the agents' impoundment of the Subaru was objectively reasonable.  It turns to the subsequent search.

The government argues the search of the Subaru was a reasonable inventory search. "The community caretaking exception also applies to an inventory search"—that is, the "search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." Id. at 203 (citation modified).  "The Fourth Amendment permits a warrantless inventory search if the search is carried out pursuant to a standardized policy," United States v. Richardson, 515 F.3d 74, 85 (1st Cir. 2008) (citing Florida v. Wells, 495 U.S. 1, 3–4 (1990)), and "on the basis of something other than suspicion of evidence of criminal activity," Sylvester, 993 F.3d at 25 (quoting Colorado v. Bertine, 479 U.S. 367, 375 (1987)).

The government contends that the search was carried out pursuant to standardized FBI protocol as set out in the DIOG.  Doc. No. 117 at 9.  Although Richards challenges the lawfulness of the predicate impoundment, he does not meaningfully challenge the lawfulness of the subsequent inventory search.[10]  See Doc. No. 108 at 4–6; Doc. No. 125 at 5–7.  In any case,

---

[9] The only direct evidence of subjective intent is the testimony of Agent Resar, who testified that he decided to impound the vehicle for its safekeeping.  Indeed, the Chicago FBI agents who impounded the car (including Agent Resar) apparently had limited involvement in the government's investigation of Richards; they were simply asked to execute the arrest warrant that had issued out of this District.  That the arresting, impounding, and inventorying agents had no investigatory role in the case further undermines any suggestion investigatory purposes drove the decision to impound—let alone that the agents had a solely investigatory purpose.

[10] Deviation from a standardized inventory policy may "call[] into question whether [the officers] were acting in their community caretaking role or for an impermissible, solely investigatory purpose."  Vick, 145 F.4th at 203.  But Richards does not identify any deviations from policy that would support an inference of pretext, and he therefore waives that argument.

12

the Court concludes that the search of the Subaru was an objectively reasonable inventory search pursuant to FBI policy undertaken for a noninvestigatory purpose.

As explained above, FBI policy authorizes inventory searches in order to "1) protect the owner's property while it is in FBI custody; 2) protect the FBI against claims of lost or stolen property; or 3) protect FBI personnel from potential danger."  Doc. No. 117-2 at 4.  The DIOG specifies: "As a general rule, after lawfully taking custody of property, FBI employees must conduct a prompt and thorough search of the contents of the property, including searching any locked or unlocked containers and inventorying their contents."  Id. at 5–6.

Here, an FBI agent inventoried the contents of the Subaru promptly after it was towed to the field office—that is, on the evening of the impoundment and the next day.  Doc. No. 108-1 at 14, 21–23.  The inventory extended to the containers found within the vehicle, such as the backpack in which the agent located an iPhone and iPad.  Id.  The agent documented the results of the inventory search in a written form.  Id.  More generally, the FBI's policy states legitimate, noninvestigatory purposes for inventory searches.  See Sylvester, 993 F.3d at 25.  The record before the Court does not show or suggest that the agents in this case were not acting pursuant to these legitimate purposes.  See United States v. Rivera, 988 F.3d 579, 582 (1st Cir. 2021).

Under the circumstances, the agents' decisions to impound the Subaru and then conduct an inventory search were objectively reasonable.  Because the government has shown that the search fell within an exception to the warrant requirement, the motion to suppress is DENIED.

---

Cf. Sylvester, 993 F.3d at 24 (defendant's failure to request district-court findings regarding pretext based on deviation from impoundment policy invoked plain-error review on appeal).  In any event, the potential deviations from policy (e.g., possible failure to provide a receipt, contrast Doc. No. 117-2 at 5–6, with Doc. No. 108-1 at 21) appear to have been relatively minor, technical defects that do not, without more, support an inference of pretext.

B.    Automobile Exception

The government alternatively contends that its search of the Subaru was reasonable under the automobile exception to the warrant requirement.  Doc. No. 117 at 11–13.  The "automobile exception" permits officers to conduct a warrantless search of an automobile—and containers within that automobile—if the officers have probable cause to believe they contain contraband or evidence of a crime.  Acevedo, 550 U.S. at 580; United States v. Hernandez-Rodriguez, 150 F.4th 10, 14 (1st Cir. 2025).  Richards does not dispute that the "automobile exception" may apply to an impounded vehicle,[11] but he argues that the officers lacked probable cause to search the Subaru.  Doc. No. 108 at 6–8; Doc. No. 125 at 7–8.

"Probable cause exists when the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found."  Hernandez-Rodriguez, 150 F.4th at 14 (citation modified).  This objective standard is satisfied when "the totality of the circumstances creates a fair probability that evidence of a crime will be found in a particular place."  Id. at 14–15 (citation modified).  The "totality of the circumstances" analysis is a practical one, reflecting the fact that "probable cause is a fluid concept . . . turning on the assessment of probabilities in particular fact contexts."  United States v. Bregu, 948 F.3d 408, 414–15 (1st Cir. 2020) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)).  Probable cause extends to "every part of the vehicle

---

[11] A warrantless search of a vehicle, if supported by probable cause, "need not be conducted contemporaneously with the seizure . . . or at the seizure site."  United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. 1990) (first citing United States v. McHugh, 769 F.2d 860, 865 (1st Cir. 1985); and then citing Michigan v. Thomas, 458 U.S. 259, 261 (1982) (per curiam)); see also United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992) ("[P]robable cause alone justifies a warrantless search of a motor vehicle seized without a warrant while parked in a public place . . . .").  Richards does not argue that, even if the officers had probable cause to search the Subaru, that search was somehow tainted by the impoundment (which the Court has concluded was objectively reasonable in any event).

14

and its contents that may conceal the object of the search."  See United States v. Ross, 456 U.S. 798, 824–25 (1982); Acevedo, 500 U.S. at 580; United States v. Lopez, 380 F.3d 538, 544–45 (1st Cir. 2014).

Under the totality of the circumstances, the officers had an objectively reasonable basis to conclude that evidence of drug trafficking would be found in the Subaru and in the backpack inside.  To start, at the time of the arrest, there was probable cause to believe Richards was involved in the management of a large-scale drug-trafficking organization ("DTO"), and that he managed his drug business, at least in part, via encrypted messages he sent using electronic devices.  See Doc. No. 108-2 ¶¶ 12–13, 29–59 (affidavit supporting criminal complaint).  During the arrest, the officers seized more than $17,000 in cash and nine prepaid debit cards from Richards's person.[12]  As the Court noted in its order resolving Richards's first suppression motion, these items are physical evidence of a drug-trafficking conspiracy—the offense for which Richards was arrested and charged.  Doc. No. 103 at 9–10 (citing United States v. Burris, 22 F.4th 781, 785 (8th Cir. 2022); United States v. Hernandez-Mieses, 931 F.3d 134, 141 (1st Cir. 2019); United States v. Lindsey, 3 F.4th 32, 39–40 (1st Cir. 2021)).  Given these facts and others—including messages indicating Richards's DTO had operations in Chicago, Doc. No. 102-2, and the fact Richards traveled, apparently alone, from Columbus to Chicago that day— agents could reasonably conclude that Richards was in Chicago "on business."

Investigators could further conclude that Richards had taken the business trip in the Subaru, and that the vehicle would contain evidence of drug trafficking.  Investigators had surveillance footage from earlier on the day of his Chicago arrest that showed Richards in Columbus, Ohio, and they had associated him with a Subaru with Ohio plates.  When he was

---

[12] Richards does not challenge the legality of the search of his person incident to his arrest.

arrested, Richards had just opened the front driver-side door of that Subaru, which was otherwise unoccupied. From the surveillance footage and events preceding his arrest, officers could infer that Richards had driven the Subaru from Columbus to Chicago that day. The surveillance footage showed Richards carrying a backpack when he left Columbus on the morning of his arrest,[13] but he was not carrying the backpack at the time of the arrest. And although the evidence supporting the criminal complaint showed Richards using electronic devices to manage a large-scale DTO—and people involved in drug trafficking often use multiple electronic devices, see, e.g., Hernandez-Mieses, 931 F.3d at 141—Richards had only one cell phone on his person when he was arrested. Taken as a whole, these circumstances support the conclusions that Richards possessed multiple electronic devices, that those devices were and/or would contain evidence of drug trafficking, and that those devices (not located on his person) were in the Subaru or the backpack within it.

In short, the evidence seized (and not seized) from Richards's person—coupled with the factual allegations in the complaint affidavit about the nature of Richards's role in a large-scale DTO and the circumstances of his arrest—gave the agents probable cause to believe the vehicle he was entering at the time of his arrest would contain evidence of a drug-trafficking conspiracy, including electronic devices and cash. Cf. Michigan v. Thomas, 458 U.S. 259, 261–62 (1982) (per curiam) (noting that discovery of contraband through inventory search gave officers probable cause to conduct more thorough search of vehicle for additional contraband). Probable cause extended to the backpack located inside the Subaru, which agents had seen Richards

---

[13] Where, as here, multiple officers participated in an investigation that led to a search, courts "look to the collective information known to the law enforcement officers participating in the investigation rather than isolating the information known by the individual acting officer." Hernandez-Rodriguez, 150 F.4th at 15 (citation modified).

16

carrying in Ohio and which could contain electronic devices, cash, or other evidence of a drug-trafficking conspiracy.  See Ross, 456 U.S. at 824–25; Acevedo, 500 U.S. at 580.

Because, under the totality of the circumstances, the officers had probable cause to search the Subaru, including the backpack within it, Richards's motion to suppress is DENIED.

IV.    CONCLUSION

For the foregoing reasons, Richards's motion to suppress (Doc. No. 108) is DENIED.

SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge